

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## INFORMAL BRIEF

No. 22-7406,   US v. Richard Wilford
          1:11-cr-00258-ELH-2

## 1. Declaration of Inmate Filing

An inmate's notice of appeal is timely if it was deposited in the institution's internal mail system, with postage prepaid, on or before the last day for filing. Timely filing may be shown by:

- a postmark or date stamp showing that the notice of appeal was timely deposited in the institution's internal mail system, with postage prepaid, or
- a declaration of the inmate, under penalty of perjury, of the date on which the notice of appeal was deposited in the institution's internal mail system with postage prepaid. To include a declaration of inmate filing as part of your informal brief, complete and sign the declaration below:

---

**Declaration of Inmate Filing**

Date NOTICE OF APPEAL deposited in institution's mail system: _3/31/2023_

I am an inmate confined in an institution and deposited my notice of appeal in the institution's internal mail system. First-class postage was prepaid either by me or by the institution on my behalf.

I declare under penalty of perjury that the foregoing is true and correct (see 28 U.S.C. § 1746; 18 U.S.C. § 1621).

Signature: _Richard Wilford_          Date: _3/31/2023_

[*Note to inmate filers: If your institution has a system designed for legal mail, you must use that system in order to receive the timing benefit of Fed. R. App. P. 4(c)(1) or Fed. R. App. P. 25(a)(2)(A)(iii).*]

---

## 2. Jurisdiction

Name of court or agency from which review is sought:   U.S. District Of Maryland

Date(s) of order or orders for which review is sought:   July 1, 2022;
                                                        May 4, 2018

## 3. Issues for Review

Use the following spaces to set forth the facts and argument in support of the issues you wish the Court of Appeals to consider. The parties may cite case law, but citations are not required.

**Issue 1.**

          SEE Attached

RECEIVED

2023 APR 10 PM 2:30

U.S. COURT OF APPEALS
FOURTH CIRCUIT

**Supporting Facts and Argument.**

SEE ATTACHED

**Issue 2.**

SEE ATTACHED

**Supporting Facts and Argument.**

SEE ATTACHED

**Issue 3.**

**Supporting Facts and Argument.**

**Issue 4.**

**Supporting Facts and Argument**

**4. Relief Requested**

Identify the precise action you want the Court of Appeals to take:

> To enter a ruling for the Dismissal of the Charge, Vacate the district court's order and Remand the case for appropriate judicial action, or to recognize the procedural and/or substantive harmful error(s) and do as justice appertain.

**5. Prior appeals (for appellants only)**

A. Have you filed other cases in this court? Yes [x] No [ ]

B. If you checked YES, what are the case names and docket numbers for those appeals and what was the ultimate disposition of each?

_____
Signature
[Notarization Not Required]

Richard Anthony Wilford
[Please Print Your Name Here]

**CERTIFICATE OF SERVICE**
**********************

I certify that on 3/31/23 I served a copy of this Informal Brief on all parties, addressed as shown below:

AUSA John W. Sippel, Jr.
Office Of The United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201

_____
Signature

| **NO STAPLES, TAPE OR BINDING PLEASE** |

No. 22-7406

UUNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,
　　　　　　　　　Respondent-Appellee,

v.

RICHARD ANTHONY WILFORD,
　　　　　　　　　Petitioner-Appellant.

---

Appeal From The United States District Court For
The Northern District Of Maryland
1:11-cr-00258-ELH-2

---

APPELLANT'S APPEAL OF THE UNITED STATES DISTRICT COURT'S
RULING ON HIS MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

---

Richard Anthony Wilford, Pro Se
Reg. No. 28670-037
FCI-Terminal Island
P.O. Box 3007
San Pedro, California 90733

Dated: March 31, 2023

## PRO SE STATEMENT

Under the authority of the Supremacy and Equal Protection Clauses of the United States Constitution and the common law authorities of Haines V. Kerner, 404 US 519 (1972); Erickson V. Pardus,551 US 89, 94 (2007), Pro Se litigant's pleadings are "to be liberally construed" and "must be held to less stringent standards" than pleadings from well-trained BAR registrees (attorneys), as to do substantial justice. id.

## RELEVANT BACKGROUND

In August of 2010, AUSA John W. Sippel Jr. was in direct communication with both case agents Todd Edwards and Mark Lester, and thereafter received briefings from them throughout the duration of the DEA's investigation of this case. On May 5, 2011, AUSA Sippel presented DEA Special Agent Mara Hewitt as a witness before a grand jury in the Northern District of Maryland for purpose of obataining a Federal indictment against Appellant and five others. The purported indictment charged a one count single conspiracy in violation of 21 U.S.C.§ 846. ECF-1. On August 25, 2011, the government obtained a purported superseding indictment which only added a forfeiture count. ECF-59 (Count 1s). On Spetember 16, 2011, appellant was arrested and brought to appear for an Initial Appearance before a Magistrate **FN:1** Judge in U.S. District Court of Maryland. ECF- 64 . On January 5, 2012, the Government file an Information against appellant charging a Forfeiture count. ECF-87 (Count 1ss). Therafter, without ever being afforded due opportunity of entering a plea to the charge(s), on December 11, 2013 appellant was made to appear for trial. ECF- 257. On December 18, 2013, the jury returned a guitly verdict on COUNT ONE.

**FN:1** Appellant was held in temporary detention that became indefinate because he was never afforded a Bail Hearing.

-2-

ECF-267. On August 7th and 12th, 2014, the court held sentencing and forfeiture hearings resulting in the court entering Judgment as to Count 1s. ECF-354; ECf-356.

Appellant filed his Motion To Dismiss For Lack Of Subject-Matter Jurisdiction on August 30, 2017. ECF-507. The Government filed its response motion. ECF-518. Appellant filed his reply. The district court entered its Memorandum (ECF-525) and Order (ECF-526) denying appellant's motion (ECF-507) by sidestepping his claim. Appellant then filed a Motion For Reconsideration (ECF-528) and on June 28, 2018 the Government filed its repsonse. Appellant filed his reply and subsequently filed Supplemental Pleading. ECF-534. On July 1, 2022, in a consolidated decision, the district court summarily denied Appellant's motions. ECF-678 sec. III at page 64. A timely notice of appeal was then filed.

### SUMMARY OF ARGUMENTS

Appellant, in pro se, will address the merits of his underlying claims by discussing how the di strict court sidestepped his claim that it proceeded to trial and entered judgment without having subject-matter jurisdiction, and erroneously denied his motion based on a finding that the court discerns nor prejudice from the lack of a formal arraignment. Although it is true that no arraignment whatsoever had occured in the case, Appellant's claim is cemented in the lack of the indispensible jurisdictional requirement of a plea to the charge as a conditioned precedent.

The jurisdiction over the subject-matter has been said to be essential, necessary indispensible and an elementary prerequisite to the exercise of judicial power. When jurisdiction is challenged in a criminal case it must be proven. A claim by an accused person challenging the subject-matter jurisdiction of the court brings all movement to a halt, until the court's subject matter jurisdiction and/or lack thereof can be determined. Scott V Sanford, 19 HOW 473; Main V. Thiboutot, 448 US 1 (1980).

-3-

Without the indispensible record fact of a plea of appellant to the charge(s), the court lacked jurisdiction to proceed with a valid trial and enter judgment.

Appellant will also discuss that the court erred in failing to appropriately address his claim that the Government's attorney's intentional misrepresentations to the May 5, 2011 Federal grand jury incroached against the grand jury's independence and was prejudicial to appellant, when AUSA Sippel himself made misleading answers which confused the grand jury with appellant and codefendant. The Fifth Amendment to the United States Constitution provides that "[n]o person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a Grand Jury... nor be deprived of life, liberty, or property without due process of law..." U.S. Const. Amend. V.

### ISSUES FOR REVIEW

ISSUE - 1    Did The United States District Court For The District Of Maryland Proceed With Trial Void of The Indispensable Jusrisdictional Requirement of Appellant's Plea to The Charge (s)?

Since the beginning of our nation's advesarial system of criminal jurisprudence and even dating back to the laws of England after the Magna Charta, it has been well-established that an accused person's plea to the government's charge(s) is absolutely essential to the court's lawful exercise of power to proceed with trial or adjudication on the merits and entry of judgment. This Nation, in both civil and criminal cases, in the first instance, follow the principle of party presentation - the courts rely on the parties to frame/join issues for decision and assign to courts the role of arbiter of matters presented by the parties. Courts around this country have made clear that until there is a duly interposed plea by or on behalf of the accussed to the government's charge(s), there is no ripe issue or controversy between the parties to which the court has the power to try and enter judgment.

-4-

The facts of the record in this case are clear. Appellant was arrested on September 16, 2011, and he was made to appear in U.S. District Court of Maryland before a magistrate judge for an "Initial Appearance" on the Government's purported indictment. The hearing was for the purpose of the court to advise him of the charges, tell him his rights, and to discuss his release status pending his next court appearance. See EXHIBIT-1 at p. 3; ECF-64; ECF-291. During this hearing, the Magistrate asked for convenience "do you want to do an arraignment while you are here" to which appellant's counsel stated "I would ask not for this -- for a lot of reasons, but no", and the Magistrate replied "no reasons needed." id. at 7. The Court should note that the Magistrate Judge never advised appellant of his right to plead to the charge(s), and that the court did not schedule for a Bail hearing, entry of plea or any other hearing. Id. **FN:2**

The very next time appellant appeared in open court was January 25, 2013 for a motions hearing. Dist. Ct. ECF-204. At no time between the 09/16/11 Initial Appearance and the 12/11/13 Trial was appellant ever asked by any judge for his plea to the Government's charging instruments. Notwithstanding this indisputable fact, on 12/11/13, the district judge misrepresented to the jury the material fact that Appellant "has entered a plea of not guilty to the indictment." See ECF-308 p. 3. It may be the prosecutor's obligation to persue his case by ensuring that the parties frame an issue, but, it is the duty of the district judge to peruse the record prior to proceeding with a felony jury trial to make certain that the defendant has pleaded to the charge. The record in this case is absolutely void of the required plea of Appellant. The district judge has since admitted that appellant was never asked by the court for his plea to the charge. ECF-445 Memorandum. Whether by mistake, inadvertence, design or neglegence, the district judge's misrepresentation was material to the jury's

---

FN:2 The Appellant was held in what he understood to be Temporary-Detention indefinately, as the court never scheduled any Bail Hearing therafter.

-5-

decision making ability and was serious constitutional error which prevented the court from validly exercising jurisdiction to try appellant and enter judgment.

Appellant's case is distinguishable to cases where a defendant had entered his plea of not-guilty in the first instance and then the charge was amended, or after a new trial was awarded, then he proceeded to trial without further plea. This case is also distinguishable from those cases where the accused is asked by the court for his plea and he stands mute or refuse to plead to the charge(s). In those cases the court may proceed in appropriate fashion since in the former issue had been joined and in the latter the court is authorized to order a plea of not guilty to be entered.

The case-or-controversy requirement subsist through all stages of federal judical proceeding. As Federal court of limited jurisdiction, the district court only have the power authorized by Article III of the United States Constitution and the Statutes enacted by Congress. Article III's constraint limits federal courts to "cases" and "controversies" of the justiciable sort satisfying the requirements of Standing, Ripeness, and Mootness. These doctrines affects whether the litigant is entitled to have the court decide the merits of the dispute or of a particular issue and presents a threshold question of justiciability - thus, if there's no issue framed between the parties then there's no controversy and the court has no business deciding the case or expounding the law in the course of doing so. The First Judiciary Act of 1789 [1 stat L. 73, Chapter 20] § 9 provided for criminal jury trials in the district courts were to be for "the trials of issues in [of] fact", meaning that there must be a duly interposed plea of not guilty to the charge by or for the defendant for the framing of the issues by the parties to be presented for decision. This Statutory principle stood in harmony with Art.-III's ripeness doctrine since the birth of our Nation's adversarial adjudication system and continues to stand firmly today. See Greenlaw

-6-

V. United States, 554 U.S. 237, 243(2008) (stating "In our advesary system, in both civil and criminal cases, in the first instance..., we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.");

The district court did not address Appellant's claim that it lacked subject-matter jurisdiction. This was error. Due-Process Clause expressly requires that a criminal defendant be given due opportunity of entereing his plea to the government's charge. U.S. Const. Amend. V. This was designed and intended for the security of personal rights. It is essential to the jurisdiction of the court, and cannot be waived by him as to set up a want of jurisdiction in the court to try him. Appellant maintains that the proceedings in this case did not provide him with the rudimentary Due-Process and Equal Protections under the law that the Constitution requires, and the district court acted without power to validly proceed with trial against him. The claim should not be ignored. A Federal district court cannot rightfully proceed with a felony criminal trial by skipping an entire critical-stage (the Plea), which affects the framework within which the trial process proceeds, at no fault of the accused, and then somehow find such error to merely be formality that did not appear to have prejudiced the accused, con-trary to established law, prejudice need not be shown and the proceedings are fundamentally unfair.

The facts here shows that appellant was denied Fifth Amendment right to enter his plea and the Sixth Amendment right to autonomy in his plea. Through the irregular process in the court he was given no due opportunity of entering any plea and the district judge somehow erroneously advised the jury he had "entered a not guilty plea to the government's indictment," then after guilty verdict sentenced him to decades in prison. No court may, consistent with due-process demands, send a man to prison for decades without first lawfully convicting him. This is more than minor technical details; it goes to the heart of the court's jurisdiction. [Ruckle V. Warden, 335 F.2d 336, 338(4th Cir 1964)]

-7-

ISSUE - 2    Did The Actions Of The Government Before The May 5, 2011
Federal Grand Jury Deprive Appellant Of Interests Protected
By The Fifth Amendment's Indictment And Due-Process Clauses,
Depriving The Court Of The Jurisdiction To Try Him?

Appellant made claim and presented evidence showing the Government's attorney
(himself) intentionally presenting the Federal grand jury with false and misleading
information; aided by perjured testimony by a Special Agent of the Drug Enforcement
Admistration ("DEA") which encroached against the independence of the grand jury and
to the prejudice of appellant. The court did not protect him from unfairness.

The grand jury, as an independent body, relies on prosecutors to initiate and
prepare criminal cases and investigates what comes before it. In the instant case,
AUSA John Walter Sippel Jr. was present while the grand jury heard the testimony
of DEA agent Mara Hewitt; he called and questioned Hewitt and drew-up the purported
indictment. EXHIBIT-2 With that great power and authority there is a correlative
duty to **not permit a person to stand trial when he knows that perjury permeates
the indictment.** United States V. Basurto, 497 F.2d 781, 785 (9th Cir. 1974). Dis-
missal of the subject-matter jurisdictional document is proper when the misconduct
of the prosecutor causes some significant infringement on the grand jury's ability to
exercise independent judgment. See U.S. V. McDonald, 61 F.3d 248, 253 (4th Cir 1995)
(dismissal of indictment proper when there's "a error in the grand jury proceeding"
which prejudiced the defendant, "substantially influenced the grand jury's decision
to indict," or "if there's grave doubt that the decision to indict was free from
substantial influence of such violation.").

The facts of this claim plainly reveals that the grand jury proceeding was
tainted by improprieties of the Government's prosecutor, showing the following:

-8-

The prosecutor presented  testimony of agent Hewitt stating-

* "Richard Anthony Wilford is believed to be the Hayes drug trafficking organization's sourse of supply, providing the organization with kilogram quantities of cocaine." EXHIBIT-2 at 8.

* "Mark Anthony Hawkins is believed to be a lieutenant for the Hayes drug trafficking organization facilitating and distributing kilo-grams of cocaine in the Baltimore area." id. FN:4

* "On March 17, 2011 agents observed Richard Wilford and Mark Hawkins exiting Stapel Office Store... Wilford and Hawkins were carrying boxes and packaging material... Agents observed Wilford and Hawkins package three boxes inside of the Stapels parking lot and **Wilford** take one of the packages into the store to be shipped via UPS." FN:3

* "Bryan Williams is believed to be a source of supply providing the Hayes drug trafficking organization with their kilogram quantities of cocaine, and Robert Nyakana is believed to be a transporter of narcotics from California to the Baltimore, Maryland area." id.at 24.

* "On April 1,2011 an intercepted phone call between Hayes and Bryan Williams included a coded conversation regarding drug transactions. During the call, Williams tells Hayes that he is going to send him some narcotic..." id.

* On April 3, 2011 Nyakanna was stopped by Troopers on I-70 in Clark County, Illinois while driving a tractor trailer containing 136 kilos of cocaine and informed officers that he was scheduled to deliver the cocaine to Bryan Williams in Jessup,Maryland. id. at 24-25.

  "Nyakanna admitted to having delivered cocaine to **Williams** four times previous in 2010..." id. at 27.

* "On April 4, 2011... a controlled delivery was initiated between Nyakanna and Bryan Williams. Williams pulled onto Crestmont Road, which is a side street that the tractor trailer was set up on for the controlled meet, wher the ten bags were put back into the tractor trailer for this particular meet, and it held all 136 kilograms of cocaine... officers arrested Bryan Williams ..." Following Williams' arrest... law enforcement determined that Hayes had called Williams several times between April 5th and 6th 2011 and sent text messages seeking to contack Williams. id. @29.

After agent Hewitt's testimony to these facts as shown, the prosecutor asked the grand jury for questions upon which an apparantly confused juror posed a question and the following exchange ocurred:

Grand Juror - "I missed something about this Mark Anthony Hawkins.

FN:3  On 3/17/11 case agent Todd Edwards made DEA-6 report on this surveillance conducted by **him** alone. On 3/21/11 agent Hewitt made a DEA-6 report altering the true facts of the surveillance conducted by agent Edwards. See EXHIBIT-3

FN:4  12/16/13 Trial testimony of Mark Hawkins, as government withness, reveals that Hawkins had no knowledge of Hayes' DTO or its menbers and sold no drugs for Hayes. ECF-306 @ 115-118

USCA4 Appeal: 22-7406    Doc: 13    Filed: 04/10/2023    Pg: 13 of 69

What was his role in this?"

Agent Hewitt  -  "Okay"

Grand Juror  -  "he was the one with Williamsat the Staples?"

AUSA Sippel  -  "That's right"

Agent Hewitt  -  "Right"

Grand Juror  -  "oh, okay"

Agent Hewitt  -  "He's Right"

AUSA Sippel  -  "He delivered the package to the Staples..."

Agent Hewitt  -  "Right"

Grand Juror  -  "Okay, Good enough for me I just -- thanks" id. @ 30-31.

The above exchange evinces a confused juror relying on the Government for clarity, but instead of providing truthful answer the AUSA provided false and misleading information. The Court should note that the jury's confusion had appeared directly following testimony of Bryan Williams' arrest during the controlled delivery of the 136 kilos of cocaine, to which AUSA Sippel referred to as the "juicy stuff" that he likes to "always save the best part for last". id. @ 23 line 25 and @ p. 24-29. It was the prosecutor who provided the initial false and misleading answer, then the witness aides him with her perjured testimony, before the prosecutor drives the falsity futher with the additional statement "He delivered the package to the Staples." id. @30. **FN: 5**

The Government's prosecuting attorney knew or should have known that false and misleading information/evidence was presented to the grand jury, yet he did not seek to correct the cancer of justice, but instead allowed the cancer to grow by not informing the grand jury or court and allowing Appellant to be placed on trial.

The constitutional guarantees protects the accused from having to stand trial in cases where deliberate deception of a grand jury by a prosecutor infringe against its independence and/or is fundamentally unfair to the accused. U.S. Const. Amend. V. It confers a right not to be tried -"no person shall be held to answer."id.

---

**FN:5** AUSA Sippel had been in direct communication with both, case agent Todd Edwards and case agent Mark Lester during August 2010, and obtained breifings from them throught the duration of the DEA's investigation into this case.

-10-

The conduct by the Government misleadingly gave the grand jury the impression that (1) Mark Hawkins was a lieutenant for the Hayes-DTO facilitating and distibuting kilograms of cocaine and who was seen with Appellant on 3/17/11 conducting business for the Hayes-DTO and; Bryan Williams, the person arrested during a controlled delivery of 136 kilos of cocaine as a fifth tractor trailer delivery within the previous year, was Appellant at Staples Office Store with Hawkins conducting business for the Hayes-DTO. Appellant maintains that his substantial rights were violated by the Government during the grand jury proceeding and the prosecutor's conduct "substantially influenced the grand jury's decision to indict," or "there's grave doubt that the decision to indict was free from substantial influence ofsuch violation." See McDonald 61 F.3d at 253. This is not a harmless error.

Appellant contends that the district court erred by failing to address this and denying his motion to dismiss. The Due Process Clause of the Consitution and the Equal Protection component thereof applies to Government act. The Due Process right has been couched in terms of a person's right to be free from an abuse of discretion on part of court's procedural side-stepping from unconstitutional due-process errors. Furthermore, the Government's purported indictment does not satisfy the Fifth Amendment Indictment Clause. Yes, there's an ethical responsibilty of the prosecutor, but there's a correspondingly heightened obligation of the judiciary to protect against even the appearance of unfairness as it relates to grand jury proceedings. The charge should've been dismissed against Appellant in this case, as the court errored by not doing so.

-11-

## CONCLUSION

Congress and the Supreme Court guarantee due-process, it is rule of the land, it is clear and not open for interpretation, and Appellant stands before this Court asking this Court to follow this path, protecting his rights as the district court sidestepped subject-matter jurisdiction requirements and created its own procedure removing protected guaranteed rights for the security of his liberty.

This case illustrates how illigitamate and unconstitutional practices get their first footing, namely, by silient deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of persons liberty should be liberally construed. It is the duty of all courts to be watchful of the constitutional rights of the citizens, and against stealthy encroachments.

Appellant deserves for this Court to provide him relief, as requested, to do justice.

RESPECTFULLY SUBMITTED,

Richard Anthony Wilford, pro-se

--12


DEFENDANT'S EXHIBIT

# Exhibit 1



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DISTRICT

- - - - - - - - - - - - - - x
                    :

**ORIGINAL**

UNITED STATES OF AMERICA,   :

                    :    Criminal No. 11-0258-ELH

     v.           :

                    :

RICHARD ANTHONY WILFORD,   :

                    :

        Defendant.   :    Baltimore, Maryland

                    :

- - - - - - - - - - - - - - x   September 16, 2011

**INITIAL APPEARANCE**

BEFORE:  THE HONORABLE BETH P. GESNER,  Judge

APPEARANCES:              JOHN SIPPEL, Esq.
                            Office of the United States Attorney
                            36 S Charles St Fourth Fl
                            Baltimore, MD 21201
                                On Behalf of the Government

                          WILLIAM PURPURA, Esq.
                          Law Offices of William B. Purpura
                          Eight E Mulberry St
                          Baltimore, MD 21202
                              On Behalf of the Defendant

Audio Operator:        Katina Tyson

Transcription Company:   CompuScribe
                          5100 Forbes Boulevard,
                          Suite 101
                          Lanham, MD 20706
                          (301) 577-5882

Proceedings recorded by electric sound recording, transcript
produced by transcription service.

# I N D E X

Page

Preliminary Matters                                              3

Court and Defendant Re: Advise of Rights                        3

Comments on Motions by John Sippel, Esq.
    Attorney for the Government                                 6

Comments by William Purpura, Esq.
    Attorney for the Defendant                                  6

Keynote:  "---" indicates inaudible in transcript.

P R O C E E D I N G S

1

2       THE CLERK:  Richard Anthony Wilford, it is criminal

3  number ELH-11-0258, John Sippel on behalf of the United States,

4  Your Honor.  The matter is before you for an initial

5  appearance.

6       THE COURT:  Thank you.

7       MR. PURPURA:  Judge Gesner, good afternoon, William

8  Purpura on behalf of Mr. Wilford.  Mr. Wilford is present.

9       THE COURT:  Good afternoon, Mr. Wilford, you can be

10  seated.

11       THE DEFENDANT:  Thank you.

12       THE COURT:  Mr. Wilford, we are here for your

13  initial appearance and the purpose of this proceeding is to

14  advise you of the charges against you, tell you what your

15  rights are and to discuss your release status pending your next

16  court appearance, do you understand that?

17       THE DEFENDANT: Yes.

18       THE COURT:  And do you have a copy of the indictment

19  there?

20       MR. PURPURA:  He does, Your Honor.

21       THE COURT:  You are charged in a superceding

22  indictment with conspiracy to distribute and possess with

23  intent to distribute cocaine in violation of Title 21 of the

24  United States Code Section 846.  The maximum penalty for that

25  offense is up to life imprisonment with the minimum mandatory

1  term of 10 years which means if you are found guilty with some

2  exceptions, the Court would be required to sentence you to that

3  minimum term.

4       There is also a possibility of a $10 million fine

5  and five years of supervised release that would follow any

6  period of incarceration.  The second part of the indictment

7  contains what is called a forfeiture count.  It basically asks

8  that certain properties be forfeited to the Government in

9  connection with the alleged offense.  There is no incarceration

10  associated with that charge but I did want to tell you what

11  that second part of the indictment is.  Do you understand what

12  the charge is and what the maximum possible penalty is?

13       THE DEFENDANT:  Yes, Your Honor.

14       THE COURT:  You have the right to remain silent with

15  respect to the charge.  You are not required to make any

16  statements and if you did, it could be used against you.  You

17  also have the right to have an attorney represent you in all

18  stages of the case.  And if you can't afford counsel, counsel

19  will be appointed for you at no cost to you.  Do you understand

20  both of those rights?

21       THE DEFENDANT:  Yes, Your Honor.

22       THE COURT:  And if you could please stand, Mr.

23  Wilford to be sworn in.  I am going to ask you a few questions.

24       (Whereupon, the defendant was sworn.)

25       THE DEFENDANT:  Yes.

1          THE CLERK:  Sir, you may put your hand down.  Pleas

2    state your full name for the record.

3          THE DEFENDANT:  Richard Anthony Wilford.

4          THE COURT:  You can be seated, Mr. Wilford.  Can you

5    tell me your age please.

6          THE DEFENDANT:  38.

7          THE COURT:  And what year were you born in?

8          THE DEFENDANT:  72.

9          THE COURT:  What is your current address?

10         THE DEFENDANT:  11 Rock Hollow Court, Elkton,

11   Maryland.

12         THE COURT:  And within the last 24 hours, have you

13   had anything to drink or taken any kind of drugs, prescription

14   or otherwise that are affecting your ability to understand what

15   is going on here?

16         THE DEFENDANT:  No.

17         THE COURT:  You understand everything so far?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And have you been retained, Mr. Purpura?

20         MR. PURPURA:  I have.

21         THE COURT:  And it is expected that you will remain

22   in the case?

23         MR. PURPURA:  Yes, it will -- I will.

24         THE COURT:  Okay, very well.  So we will expect that

25   Mr. Purpura is going to be representing you through the balance

1  of the case, Mr. Wilford.

2        THE COURT:  What is the Government's position on

3  release?

4        MR. SIPPEL:  Your Honor, the Government is seeking

5  detention in this matter.

6        THE COURT:  For?

7        MR. SIPPEL:  For a risk of flight and danger to the

8  community.

9        THE COURT:  Okay and counsel have you talked about

10  the hearing?

11        MR. PURPURA:  Your Honor, at this point we are going

12  to reserve on our request for a hearing for detention.

13        THE COURT:  Okay, do you want to consent at the time

14  being?

15        MR. PURPURA:  We will consent to the time being.

16        THE COURT:  Okay.  Mr. Wilford, the Government is

17  asking that you be held in custody pending your trial.  You are

18  entitled to have a hearing to see if release conditions can be

19  set.  You can waive that hearing today and come back at any

20  later time that you like and ask that a hearing be scheduled.

21  Do you understand that?

22        THE DEFENDANT:  Yes.

23        THE COURT:  And understand that you are willing to

24  agree to detention for the time being?

25        THE DEFENDANT:  Yes, Your Honor.

1      THE COURT:  On a consent order -- does Mr. Wilford

2  have any medical or mental health needs that need to be

3  addressed?

4      MR. PURPURA:  He doesn't.  He does not.

5      THE COURT:  And I don't know if you have had enough

6  time, but do you want to do an arraignment while you are here?

7      MR. PURPURA:  I would ask not for this -- for a lot

8  of reasons, but no.

9      THE COURT:  No reasons needed.

10      MR. PURPURA:  Thank you.

11      THE COURT:  Is there anything else?

12      MR. SIPPEL:  No, Your Honor.

13      THE COURT:  Thank you.

14      MR. SIPPEL:  Thank you, Your Honor.

15      MR. PURPURA:  Thank you, Your Honor.

16      (Whereupon, the hearing concluded.)

17

18

19

20

21

22

23

24

25

# Exhibit 2

# ORIGINAL

## UNITED STATES DISTRICT COURT
## BALTIMORE, MARYLAND

```
1
2
3   - - - - - - - - - - - - - - x
                                 :
4   UNITED STATES OF AMERICA     :
                                 :
5   VS.                          :
                                 :
6   LAWRENCE LEE HAYES, JR., et al. :
    (2010R01045)                 :
7   - - - - - - - - - - - - - - x
8
9
10
11                          Grand Jury Room - 8th Floor
                            Garmatz Federal Courthouse
12                          Baltimore, Maryland 21201

13                          Thursday, May 5, 2011

14          The testimony of MARA HEWITT was taken in the

15  presence of a full quorum of the Grand Jury, commencing at

16  11:04 a.m., before:

17

18          JOHN W. SIPPEL
            Assistant United States Attorney
19
20
21
22
23
24
25
```

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02455

ELH-11-0258

I N D E X

| Exhibit No. | Description | Marked |
|---|---|---|
| 1 | Lab Report | 11 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02456

P R O C E E D I N G S

Whereupon,

MARA HEWITT

was called as a witness and, after first being duly sworn by the Foreperson of the Grand Jury, was examined and testified as follows:

EXAMINATION

BY MR. SIPPEL:

Q.   Good morning, Special Agent Hewitt.

A.   Good morning.

Q.   If you would, please state your full name and your current duty assignment.

A.   My name is Mara Hewitt. I'm a special agent with the Drug Enforcement Administration.

Q.   And how long have you been with DEA?

A.   Approximately a year and a half.

Q.   And prior to becoming employed with DEA as a special agent, were you employed in any other law enforcement roles?

A.   I was. I was with the United States Capitol Police as a federal law enforcement officer for four years.

Q.   And, Special Agent Hewitt, if you would, tell the ladies and gentlemen of the grand jury a little bit about your training and experience, both with DEA and as a U.S. Capitol Police officer.

A.   With the U.S. Capitol Police, I trained in FLETC for

USA-02457

1    A.    Yes, I have.

2    Q.    And have you prepared some of those documents or

3    those --

4    A.    Yes.

1    about six months, and then with the DEA, I trained at

2    Quantico, Virginia for about four months. And during my law

3    enforcement career, I've worked with local, state and federal

4    law enforcement agencies in numerous drug investigations

5    resulting in arrest and prosecution of individuals charged in

6    various drug charges and the seizure of drugs and assets.

7    Q.    And, Special Agent Hewitt, turning now to the case

8    at hand, were you involved in the investigation of Lawrence

9    Lee Hayes, Jr., Richard Anthony Wilford, Bryan Eammon

10   Williams, George Lamar Plunkett, Mark Antony Hawkins and

11   Robert Nyakana?

12   A.    Yes, I was.

13   Q.    And were there other law enforcement officers

14   involved in that investigation?

15   A.    Yes, there were.

16   Q.    And have you discussed the investigation with those

17   other law enforcement officers?

18   A.    Yes, I have.

19   Q.    So your base of knowledge about this case is based

20   not only on your role in the investigation, but also on what

21   other law enforcement officers have told you?

22   A.    Yes.

23   Q.    And have you also reviewed reports that were

24   prepared relating to the investigation of the six individuals

25   that I mentioned previously?

USA-02458

1    A.   Yes, I have.

2    Q.   And have you prepared some of those documents or

3 those --

4    A.   Yes.

5    Q.   Okay.  You have?

6    A.   Yes, I have.

7    Q.   And have some of those documents been prepared by

8 other law enforcement officers?

9    A.   Yes, they have.

10    Q.   Okay.

11         MR. SIPPEL.  So ladies and gentlemen of the grand

12 jury, what that means is Special Agent Hewitt's testimony

13 today is going to be based in part on her own eyewitness

14 account and her own knowledge about her own investigation, but

15 also on information that was told to her by other law

16 enforcement officers and reports prepared by other law

17 enforcement officers.  As you know -- and which means that

18 she's going to be relying in part on hearsay in her testimony

19 with you today.

20         As I'm sure you've been told before, you are free to

21 rely on hearsay in determining whether there's probable cause

22 to return an indictment. But if for any reason you want me to

23 bring a particular witness or show you a particular document,

24 if those documents are available, I'll make all efforts to

25 bring those documents or bring those folks to you.

USA-02459

ELH-11-0258          USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 30 of 69

1    BY MR. SIPPEL:

2    Q.   Special Agent Hewitt, tell the ladies and gentlemen

3    of the grand jury how this investigation as to Hayes, Wilford,

4    Williams, Plunkett, Hawkins and Nyakana began.

5    A.   Sure.  Good morning.  Like I said earlier, my name

6    is Mara Hewitt, special agent with the DEA.  Just give you a

7    little bit of a case background on this investigation.  We

8    started this case back in August of 2010, when a confidential

9    source advised law enforcement about the target subject,

10   Lawrence Lee Hayes, AKA Boo, and the Hayes drug trafficking

11   organization, which is responsible for distributing multi

12   kilograms of cocaine in the Baltimore City area.

13           Based on the information received from the

14   confidential source, surveillance and accessing law

15   enforcement databases, officers identified Boo to be Lawrence

16   Lee Hayes, Jr., and it was discovered that Hayes was utilizing

17   several different locations throughout the city to further his

18   drug trafficking organization and that he was in contact with

19   several different individuals who assisted him in either

20   transporting, manufacturing or distributing the cocaine or

21   cocaine base.

22           And based on the information, an investigation was

23   initiated.  And during the investigation, agents gathered

24   intelligence, including but not limited to, through the

25   research of law enforcement databases, issuance of

USA-02460

ELH-11-0258

USCA4 Appeal: 22-7406    Doc: 13    Filed: 04/10/2023    Pg: 31 of 69

1  administrative subpoenas, debriefing of confidential source,

2  conducting surveillance and wiretaps.

3      Q.  Okay.  Why don't you give a little bit of

4  background, if you would, about the target subjects in this

5  case, starting with Lawrence Lee Hayes, Jr.?

6      A.  Sure.  During the investigation into the Hayes drug

7  trafficking organization, through the things I mentioned

8  earlier, surveillance, wiretaps, agents have intercepted

9  individuals engaged in conversations about their criminal

10 activity involving narcotics trafficking.  Agents were also

11 able to obtain a better understanding of the roles that each

12 participant in this drug trafficking organization plays.

13      The first person is Lawrence Lee Hayes, Jr., that I

14 mentioned before, AKA Boo.  He is believed to be the leader of

15 the Hayes drug trafficking organization and is believed to be

16 responsible for obtaining the cocaine for the organization.

17 He is transporting it and the money, as well as directing

18 other members of the organization to distribute the cocaine,

19 or the kilogram quantities of cocaine through the metropolitan

20 Baltimore area.

21      The next individual is George Lamar Plunkett.  He is

22 believed to be the lieutenant of the Hayes drug trafficking

23 organization who helps oversee the day to day operations of

24 the organization.

25      Who is next on my list?  Richard Anthony Wilford is

**FREE STATE REPORTING, INC.**
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02461

1  believed to be the Hayes drug trafficking organization source
2  of supply, providing the organization with the kilogram
3  quantities of cocaine.
4        Mark Anthony Hawkins is believed to be a lieutenant
5  for the Hayes drug trafficking organization, facilitating and
6  distributing kilograms of cocaine in the Baltimore area.
7        Bryan Eammon Williams is believed to be a source of
8  supply, providing the Hayes drug trafficking organization with
9  kilogram quantities of cocaine.
10       And Robert Nyakana is believed to be a transporter
11 of the narcotics from California to the Baltimore, Maryland
12 area.
13       Q.    Okay.  Special Agent Hewitt, why don't you tell the
14 ladies and gentlemen of the grand jury what your investigation
15 revealed, starting in 2010?
16       A.    Okay.  Like I said before, Hayes is believed to be
17 the leader of this organization, and George Lamar Plunkett is
18 believed to be the lieutenant.
19       And so some of the information that we've gathered
20 through our investigation on these two individuals:
21       For example, on or about November 4th of 2010,
22 agents observed Plunkett at a residence located at 301 West
23 27th Street in Baltimore, Maryland.  Police intelligence
24 indicated that this address is the one that's listed on Hayes'
25 driver's license, his Maryland driver's license.  Agents

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1  believe that 301 West 27th Street is being utilized to convert

2  cocaine hydrochloride into crack cocaine, or the cut location.

3          During surveillance, agents observed Plunkett walk

4  to a nearby 7-Eleven convenience store and purchase several

5  roles of paper towels before returning to the residence.

6  Agents know, based on their knowledge, training and

7  experience, that paper towels are often used by persons

8  converting cocaine hydrochloride into crack cocaine. Agents

9  believe that Plunkett was going to utilize the paper towels

10 purchased at this 7-Eleven to convert the cocaine

11 hydrochloride into crack cocaine.

12          On February 10th, 2011, agents observed Hayes, AKA

13 Boo, enter Apartment No. 717 at Belvedere Towers Apartments,

14 located at 1190 West Northern Parkway in Baltimore, Maryland.

15 Hayes was carrying a large cardboard box, and agents observed

16 Plunkett enter the apartment empty-handed. Agents believed

17 that the Hayes drug trafficking organization is utilizing

18 Apartment 717 in the Belvedere Towers apartment building as a

19 stash location for the storage of their drugs and money.

20          Agents then observed Plunkett leaving Apartment 717

21 carrying two large cardboard boxes and a small white plastic

22 bag. Agents observed Plunkett walk to the side of the

23 Belvedere Towers Apartments next to the large community trash

24 Dumpster. And shortly after, agents observed him leaving the

25 trash Dumpster empty-handed. Agents believe that Plunkett had

USA-02463

1  placed the two large cardboard boxes and the white plastic bag

2  into the Belvedere Towers Apartments community Dumpster.

3          Subsequently, agents entered the Dumpster and

4  located the following items:

5          Approximately four Compaq computer boxes, all of

6  which had the shipping labels torn off.  One box contained a

7  UPS shipping sticker.

8          Two black Compaq Presario computer shells.  One of

9  the computer shells was closely examined, and officers

10 observed black pieces of paper taped to the inside of the

11 computer shell, facing out, covering up the manufacturer

12 openings.  This is something that -- it's utilized to -- which

13 are made to allow heat to escape the internal working parts of

14 the computer, of the computer shell in order to prevent law

15 enforcement from looking into the computer shell.  So it's

16 kind of a preventative.

17          And a small white plastic bag believed to be the

18 same bag that agents observed Plunkett carrying when he left

19 Apartment 717.  The bag was located in close proximity to the

20 large cardboard boxes, and officers did not observe any other

21 items in the Dumpster that were similar in size, shape or

22 color.  Inside the white plastic bag, agents observed kilogram

23 packaging material containing white powder residue, a small

24 plastic bag containing white powder residue, and two empty

25 boxes of Family Value's old lock top sandwich bags, 100 bags,

USA-02464

1   a white latex and/or plastic glove, and a purple latex plastic

2   glove, and a used razor blade cutting instrument.

3           The white powder residue was field tested utilizing

4   a narcotic identification kit, and the test yielded positive

5   results for the presence of cocaine. The white powder residue

6   was later analyzed by the Mid-Atlantic Lab of the DEA, which

7   confirmed the presence of cocaine.

8       Q.   Special Agent Hewitt --

9       A.   Sure.

10      Q.   I'm just going to stop you right there, and I'm

11  going to show you what I'll have marked --

12          MR. SIPPEL.   Do you have an exhibit sticker?

13          COURT REPORTER.   Yes.

14          MR. SIPPEL.   Right here? We're going to have

15  marked as Grand Jury Exhibit No. 1.

16                          (Whereupon, Grand Jury Exhibit

17                          No. 1 was marked for

18                          identification.)

19          BY MR. SIPPEL:

20      Q.   And, Special Agent Hewitt, can you identify that

21  document?

22      A.   Sure. This is the Mid-Atlantic Laboratory results

23  and conclusions of that test, and it confirms here the active

24  drug ingredient is cocaine.

25      Q.   All right. Thank you. Okay. What else did law

USA-02465

1   enforcement agents observe and investigate during the

2   investigation of the Hayes drug trafficking organization?

3     A.   As we continued our investigation and surveillances,

4   on April 18th, 2011, agents observed Plunkett exit 301 West

5   27th Street in Baltimore, Maryland, which I earlier described

6   to be the suspected cut location, carrying a large garbage

7   bag.   Agents observed Plunkett place the garbage bag in the

8   rear seat of his vehicle.  Officers observed Plunkett get into

9   his vehicle and exit the area.  Agents surveilled Plunkett to

10   Belvedere Towers Apartments, 1190 Northern Parkway, which I

11   had mentioned earlier to be considered the stash location for

12   this drug trafficking organization.  Agents observed Plunkett

13   enter Apartment 717 and exit the apartment shortly after.  As

14   previously stated, it was the suspected stash location for

15   narcotics and currency.

16     Agents observed Plunkett get into his vehicle and

17   drive to the largest Dumpster located on the side of the

18   Belvedere Apartment building.  Agents observed Plunkett get

19   out of his vehicle and throw that large garbage bag into the

20   Dumpster.  After Plunkett left the area, agents retrieved the

21   large garbage bag from the Dumpster.

22     Located inside the bag was a broken Pyrex container,

23   used paper towels, two empty boxes of baking soda, and several

24   opened vacuum-sealed plastic bags which contained white powder

25   residue.  The residue in one of the vacuum-sealed plastic bags

USA-02466

1  was field tested at the time, and the results indicated

2  positive for the presence of cocaine.

3      Q.   Special Agent Hewitt, also, if you would, explain to

4  the ladies and gentlemen of the grand jury, based on your

5  knowledge training and experience as a DEA agent, the

6  significance of the paper towels and the baking soda coupled

7  with the residue which field-tested positive for cocaine, what

8  significance does that have to you as a DEA agent?

9      A.   These are all supplies that are used for breaking

10  down the cocaine hydrochloride and cracking down, so to say,

11  the cocaine that they were getting and preparing for

12  distribution.

13      MR. SIPPEL.   And before we go any further, since

14  you're a relatively new grand jury, has anyone explained to

15  you how cocaine hydrochloride is converted to crack cocaine?

16      GRAND JURORS.   No.

17      MR. SIPPEL.   Would you like to know that?

18      GRAND JURORS.   Yes.

19      BY MR. SIPPEL:

20      Q.   Would you like to give them a primer on how --

21      A.   I --

22      Q.   Just in basic forms.

23      GRAND JUROR.   Let me take notes.

24      WITNESS.   I don't have it in front of me.

25      BY MR. SIPPEL:

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area. (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02467

ELH-11-0258   USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 38 of 69

1    Q.   Just real basic, not complicated, but just how it's

2  cooked down with the --

3    A.   It's actually a little bit more -- it's not that

4  basic, and I don't really have it in front of me to kind of go

5  in order as far as the different ways that it can be done.

6    Q.   Do you want me to get -- do you want me to ask Todd?

7    A.   Sure.

8    Q.   All right.

9    MR. SIPPEL.  Todd Edwards, who is another DEA

10  agent, he's outside.  If you wouldn't mind, I'm going to ask

11  Todd to come in.  He'll explain it to you, because I think it

12  might help you understand why the significance of some of the

13  things that they're finding, how it all boils down into why

14  they're certain that it's cocaine being cooked down to -- and

15  you'll hear that term a lot, cocaine being cooked down to

16  crack, because that's essentially, as Todd and Mara will tell

17  you, that's essentially what's going on.

18    WITNESS.  And he may be able to give you the Cliff

19  Notes version of it whereas I know a little bit --

20    GRAND JUROR.  Drugs for dummies.

21    WITNESS.  Right.  Sorry.

22    (Whereupon, at 11:19 a.m., the witness was excused

23  and subsequently recalled at 11:26 a.m.)

24    BY MR. SIPPEL:

25    Q.   Special Agent Hewitt, let's continue.

1    A.   Okay.

2    Q.   So based on what was found in that trash -- in that

3 Dumpster, were law enforcement agents -- did it reach any

4 conclusions about what was found?

5    A.   Right.  We were able to field-test it at the spot,

6 and it tested positive for presence of cocaine.

7    Q.   And how about the significance of the empty computer

8 shells and cardboard boxes?

9    A.   Well, throughout our investigation, not just this

10 particular day of surveillance, but we're kind of discovering

11 a trend or a routine that this particular drug trafficking

12 organization uses, their method of how they're getting drugs

13 into the city from California, how they're sending money to

14 California, how they're preparing it here, where they're going

15 to do it.  So based on everything that you've just heard and

16 what I've described, we believe that the Hayes drug

17 trafficking organization is one, using that Belvedere's Tower

18 Apartments, No. 717, as their stash location, 301 West 27th

19 Street as their cut location, and that the Hayes DTO is using

20 these empty computer shells contained within these cardboard

21 boxes as their transport for their kilogram quantities of the

22 cocaine.

23    Q.   And, Special Agent Hewitt, not to put you on the

24 spot again, but if you could give the ladies and gentlemen of

25 the grand jury a quick summary of the difference between a

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02469

ELH-11-0258

USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 40 of 69

1  stash house and a cut house and why drug dealers have one or
2  the other or both?
3      A.   Sure.  Really, it's all about eluding police.  They
4  don't want anyone to know that this is what they're doing on a
5  day-to-day basis, so they don't want to keep any of their
6  narcotics or any of their large sums of money in one place at
7  one time.  So this drug trafficking organization utilizes
8  several different locations to keep their product.
9          The difference between a stash location and a cut
10 location is they're using the cut location to prepare it.  So
11 that's kind of where they do all the chemistry of it all.  And
12 then they move it somewhere else so that once it's done and
13 the product is done, it's left in a different location for
14 you know, one, to elude police, but also if there's other
15 people that are involved, other individuals in this drug
16 trafficking organization, they can come and go freely as they
17 need to, to access the stash, so to say.
18     Q.   So it's fair to say that this is really done for
19 subversion and to elude law enforcement, is that fair?
20     A.   Yes, that's correct.
21     Q.   And is it also accurate to say that sometimes drug
22 dealers or drug organizations, such as the Hayes drug
23 organization, would have a separate location for what is
24 commonly referred to as a money house, where money is kept?
25     A.   Yes, that's correct.  A lot of these narcotics

USA-02470

ELH-11-0258     USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 41 of 69

1  dealers or distributors are afraid to keep their money and

2  their stash in the same spot. So sometimes -- because if the

3  stash house -- say the stash house gets found out, they won't

4  lose any money. Or if the money house gets found out, they

5  won't lose any drugs. It's keeping everything separate

6  especially since they have themselves a lot of people in and

7  out and in and out, they want to keep everything, you know,

8  organized and apart.

9       Q.   Great. Sorry to put you on the spot again.

10          All right. Let's turn now to Defendant Wilford and

11  Hawkins.

12       A.   Okay. Like before, Richard Anthony Wilford is

13  believed to be one of the sources of supply for this drug

14  trafficking organization, and he provides the organization

15  with the kilogram quantities of cocaine. And Mark Anthony

16  Hawkins is believed to be a lieutenant for this drug

17  trafficking organization who facilitates and distributes the

18  kilograms of cocaine in the Baltimore area.

19          So during our investigation, on October 8th, 2010,

20  agents observed Hayes meet with Wilford in Baltimore City.

21  Agents observed Wilford give a large cardboard box to Hayes.

22  Shortly after, Hayes was observed exiting the Belvedere Towers

23  Apartments, like I mentioned earlier, the stash location.

24  Prior to this date, officers have observed Hayes going to the

25  Belvedere Towers for several occasions on short durations, and

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02471

1    it was believed that Hayes was utilizing that No. 717

2    apartment as the stash house.

3            On October 22nd of 2010, agents observed Hayes meet

4    Wilford in Baltimore City again at the same location where he

5    had met him earlier, on October 8th. Agents observed Wilford

6    obtain a backpack from Hayes' vehicle, and Hayes obtained a

7    large cardboard box from Wilford's vehicle. Subsequently,

8    agents observed Hayes taking the brown box back to Belvedere

9    Towers Apartments, which was previously mentioned again as the

10   stash location for this drug trafficking organization.

11           On December 17th, 2010, agents observed Hayes and

12   Wilford in the Baltimore City area at the same location again,

13   observed Hayes and Wilford previously meet Wilford -- oh,

14   Wilford provided Hayes with a large cardboard box. Hayes got

15   into Wilford's vehicle and Wilford drove away. Approximately

16   ten minutes later, agents observed Wilford's vehicle at the

17   Belvedere Towers, Apartment 717. Subsequently, agents

18   observed Hayes carrying a large cardboard box into the

19   Belvedere Towers. And approximately six minutes later, agents

20   observed Hayes exit the apartment building empty-handed.

21   Hayes got into Wilford's vehicle, and Wilford drove away.

22           In January of 2011, officers conducted surveillances

23   on one of Wilford's vehicles, which was located at the BWI

24   Airport. Located inside the vehicle was a large bag

25   containing the motherboards of computers. Based on this and

USA-02472

1  all the previous information that I have given you up until

2  this point, during surveillance of the Hayes drug trafficking

3  organization, officers have summarized that the Hayes DTO was

4  having cocaine shipped to Baltimore in boxes that contained

5  shells of computers with the cocaine secreted inside the

6  computers.

7          Officers contacted UPS and served them with an

8  administrative subpoena.  Based on the results of the

9  subpoena, officers learned that the Hayes drug trafficking

10 organization had had at least 19 boxes, each weighing

11 approximately 45 pounds, delivered to either 1500 Cliftview

12 Road, a house owned by Wilford, or to 35 Mainview Court in

13 Baltimore, which is the residence of Derek Barbour who I'll

14 talk about later.

15         It was also discovered that approximately 32

16 packages, each weighing approximately 15 pounds, have been

17 shipped to California from Baltimore by Wilford.

18         On March 17th, 2011, agents observe Richard Wilford

19 and Mark Hawkins exiting the Staples office store located at

20 803 Goucher Boulevard in Towson, Maryland.  Wilford and

21 Hawkins were carrying boxes and packaging material.  The store

22 is a known location where Wilford has shipped packages to Los

23 Angeles, California via UPS before.

24         Agents observed Wilford and Hawkins package three

25 boxes inside the Staples parking lot and Wilford take one of

USA-02473

1   the packages into the store to be shipped via UPS. During the

2   surveillance, it should be noted that agents observed a young

3   child in the car the entire time that they were packaging

4   these boxes to be shipped to California in the trunk area.

5         Based on the observations in the Staples parking lot

6   of Richard Wilford and Mark Hawkins, Sergeant Andy Johnson of

7   the Maryland State Police notified UPS of the suspicious

8   nature of the package left at the Staples store, located in

9   Towson, Maryland. A K-9 scan was completed on the package,

10   and the results yielded positive for the odor of a controlled

11   dangerous substances.

12   Q.   Special Agent Hewitt, I'm just going to interrupt --

13   A.   Sure.

14   Q.   -- because the ladies and gentlemen of the grand

15   jury may not have heard that term before, a K-9 scan.

16   A.   Oh, I apologize --

17   Q.   It's pretty self-explanatory, but tell, yeah, tell

18   the ladies and gentlemen of the grand jury what a K-9 scan is.

19   A.   Sure. The metropolitan state police officers, there

20   are K-9 officers. These officers are assigned dogs that they

21   are -- and the dogs are utilized to sniff, and they're

22   trained, they're highly trained, to sniff drugs. Some of them

23   are trained for bombs or chemical agents, things like that.

24   And so they place the box along with other boxes around it as

25   diversion or a distraction for the dog, let the dog walk

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02474

ELH-11-0258

USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 45 of 69

1  around the different boxes, and hit on a box that they are

2  trained to alert to as having chemicals or any sort of

3  narcotic substance in it.  And when that dog was alerted, it

4  was on this particular box, the same box, that Wilford and

5  Hawkins had brought into the store.

6      MR. SIPPEL.  Has anyone see that before, like, on

7  television?

8      GRAND JUROR.  Um-hum.

9      MR. SIPPEL.  I mean, it's pretty remarkable, I

10 mean, from my -- from what I think what these dogs can sniff

11 out.  And I mean, I'm not saying that they're always right,

12 but it's pretty remarkable.

13     GRAND JUROR.  Most of the time usually -- seen over

14 at BWI, like, airport scans and if they search -- they'll sit

15 and then they alert.  They just sit in a certain way by the

16 box --

17     MR. SIPPEL.  Right.

18     GRAND JUROR.  They're trained --

19     MR. SIPPEL.  Right.  They all have --

20     WITNESS.  Right.

21     MR. SIPPEL.  Right.  They all have their own alert

22 system.  Some of them will bark, some of them will sit, some

23 of them are taught to paw.  They all have their own little

24 different ways of alerting.  So most of them, I know, locally,

25 it seems to be the sit, what you said.

USA-02475

1     WITNESS.  Right.

2     GRAND JUROR.   Right.

3     MR. SIPPEL.   If they alert, they immediately sit

4  down, and that way the officer knows that the box or whatever

5  close to them, they know that there's something in that box?

6     WITNESS.   Yeah.  When I was at Capitol Police, we

7  had a K-9 division also, but they were trained to alert on TNT

8  or any sort of explosive materials, and they sniffed around

9  vehicles during, like, vehicle checks before they could enter

10  the Capitol premises.  So, yeah, they're all different.  It's

11  very interesting.

12     BY MR. SIPPEL:

13     Q.   Yeah.  So tell the ladies and gentlemen of the grand

14  jury what happened after the K-9 scan and the alert on the

15  box.

16     A.   Sure.  Subsequently, after the K-9 scan, because it

17  alerted on that box, agents requested and obtained a search

18  and seizure warrant of that package.  Agents executed the

19  search warrant and located $100,000 in U.S. currency concealed

20  within a Magnavox VCR/DVD player.  It should be noted that it

21  not uncommon for CDS, or for narcotics, to be found after a K-

22  9 scan has alerted to narcotics since items can be

23  contaminated with the odor of a narcotic.  So just because it

24  was money inside that VCR, if that money had been transported

25  to anyone of either the cut location, the stash location or

1  had been handled by anybody who had been handling any of the

2  narcotics, that residue is going to -- that dog is going to

3  sniff out that residue.  It's going to smell the narcotics on

4  the money.  Agents believe that Wilford is the source of

5  supply, and it is possible that the moneys that were being

6  shipped to California in that package contained that odor of

7  narcotics.

8        In addition, through technological-aided

9  surveillance, upon leaving the store, Wilford took the

10  remaining two packages -- because they packaged three packages

11  in that parking lot that day that was observed -- the

12  remaining two packages to other Staple [sic] and Office Depot,

13  so within the city limits of Baltimore to be shipped to

14  California through UPS.  So they have three packages.  They

15  made a point to go to three different stores to send all three

16  packages to California via UPS.

17        And that, again, is to elude law enforcement so

18  that -- like what happened with this package, we were able to

19  search and seize one, but the other two got away.  So that's a

20  method or technique that they used.  Also, the Long Beach

21  Police Department in Long Beach, California, had seized

22  $79,650 in U.S. currency back in August of 2010, which was

23  also concealed within the same -- in a similar Magnavox

24  VCR/DVD combo player like the one that we had seized.

25      Q.   All right.  Now on to the juicy stuff.  Tell the

1   ladies and gentlemen of the grand jury about Bryan Eammon

2   Williams and Robert Nyakana.

3          A.    Okay.

4          Q.    Always save the best part for last.

5          A.    Bryan Eammon Williams is believed to be a source of

6   supply providing the Hayes drug trafficking organization with

7   their kilogram quantities of cocaine, and Robert Nyakana is

8   believed to be a transporter of the narcotics from California

9   to the Baltimore, Maryland area.

10               On April 1st in 2011, an intercepted phone call

11  between Hayes and Bryan Williams included coded conversation

12  regarding drug transactions. During the call, Williams tells

13  Hayes that he is going to send him some narcotics, but the way

14  he says it is "I'm going to send you a get well card," at the

15  beginning of the following week.

16               On Sunday, April 3rd, 2011, Illinois state troopers

17  in Clark County stopped a Penske tractor trailer truck on I-70

18  for speeding. Officers received consent to search the trailer

19  from the driver, who was Robert Nyakana. During officer's

20  search of the trailer, he discovered approximately 136

21  kilograms of cocaine inside ten black bags.

22         Q.    And tell them what was -- tell them also what the

23  truck was loaded with.

24         A.    Strawberries, like, pallets, like, 30 pallets of

25  fresh strawberries that were destined to go to the Giant

USA-02478

ELH-11-0258

USCA4 Appeal: 22-7406    Doc: 13    Filed: 04/10/2023    Pg: 49 of 69

1   Supercenter store.

2        Q.   Those are some magic strawberries, I tell you.

3        A.   So there were tons of strawberries, and then amongst

4   the strawberries were these ten black bags filled with

5   cocaine.

6             GRAND JUROR.   One question.   What would be the --

7   if you don't mind interrupt -- what is the street value of

8   those drugs?

9             WITNESS.   I'm actually going to get to that,

10            GRAND JUROR.   Oh, I'm sorry.

11            MR. SIPPEL.   Yeah.

12            WITNESS.   Yeah, I'm going to get to that --

13            MR. SIPPEL.   Yup.

14            WITNESS.   Yeah, because there's a bunch of numbers

15   in here.

16            GRAND JUROR.   Oh, okay.

17            WITNESS.   Nyakana volunteered information regarding

18   the delivery and destination of the bags.   He informed the

19   Illinois state troopers that he was scheduled to deliver the

20   bags of cocaine to Bryan Williams in Jessup, Maryland, and he

21   was to receive approximately $200,000 as payment for the

22   transportation of the cocaine to Williams.

23            Now, you had asked what the street value was of the

24   cocaine.   That $200,000 was a transport fee only.   It had

25   nothing to do with how much the actual delivery was worth.   He

USA-02479

1  was just getting that money -- that was his impression, he was

2  getting $200,000 just for delivery.

3          GRAND JUROR.   You said it was 136 kilos?

4          WITNESS.   Correct.

5          GRAND JUROR.   And a kilo is a little bit more than

6  two pounds?

7          WITNESS.   It's about --

8          MR. SIPPEL.   Yeah.

9          WITNESS.   Yeah, a little bit, yeah.

10          GRAND JUROR.   So it's over 270 pounds of cocaine

11  were in that truck?

12          WITNESS.   Yeah.

13          GRAND JUROR.   Okay.

14          WITNESS.   And it was approximately about $1,000

15  each.

16          MR. SIPPEL.   Yeah.  Let's do this.  Hold on.  Jot

17  down your questions --

18          WITNESS.   Sorry.

19          MR. SIPPEL.   We'll get to all your questions at the

20  end --

21          WITNESS.   Yeah.

22          MR. SIPPEL.   And then we'll follow up and we --

23          WITNESS.   I have a little bit of a breakdown of it.

24          MR. SIPPEL.   -- can circle, yeah, we can circle

25  back around.

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02480

1              WITNESS.  Okay.

2              MR. SIPPEL.  I bet you a lot of your questions are

3      going to be answered in the next couple minutes.

4              WITNESS.  Okay.  On Monday, April 4th, so the next

5      day, agents interviewed Robert Nyakana at the Maryland State

6      Patrol Police Barracks in College Park, Maryland.  During the

7      interview, Nyakana positively identified Bryan Williams from a

8      photo and provided a telephone number for Bryan Williams.  I

9      have the phone number here, but should I say it --

10             BY MR. SIPPEL:

11        Q.   No, it's not relevant.

12        A.   It doesn't matter, okay.  Agents have confirmed that

13     this telephone number is the same that was being utilized by

14     Bryan Williams and has been identified as contacting Hayes on

15     a court-authorized wiretap.

16             Nyakana admitted to having delivered cocaine to

17     Williams four times previously in 2010, so four times in one

18     year.  The first load Nyakana transported contained two bags

19     of cocaine, which he had received $8,000 from Bryan Williams

20     as a payment just for delivery.  The second load Nyakana

21     transported contained three bags of cocaine, which he had

22     received $30,000 from Bryan Williams as payment for delivery.

23     The third and fourth load that Nyakana transported contained

24     five bags of cocaine in which he received $100,000 from

25     Williams as payment for delivery for each delivery.

USA-02481

ELH-11-0258          USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 52 of 69

1    Nyakana stated he was receiving approximately 2,000
2  per key of cocaine from Bryan Williams.  This load involved
3  ten bags, containing 136 kilograms of cocaine, which hold an
4  approximate wholesale value of $4 million, over $4 million,
5  and an approximate street value of $13 million.  That was just
6  this load.

7    On April 4th, 2011, a controlled phone call was
8  placed by Nyakana to Bryan Williams, as witnessed by agents.
9  Nyakana planned to meet Williams at the La Quinta Inn on
10  Crestmont Road and Route 1 in Jessup, Maryland.

11    On April 4th, the same day, a controlled delivery
12  was initiated between Nyakana and Bryan Williams.  Williams
13  pulled onto Crestmont Road, which is a side street that the
14  tractor trailer was set up on for the controlled meet, which
15  the ten bags were put back into the tractor trailer for this
16  particular meet, and it held all 136 kilograms of cocaine.
17  Williams expressed to Nyakana that he felt like he was being
18  watched, and Nyakana confirmed this later to agents, who could
19  see from afar that he was having some hesitation in doing the
20  deal.  And then when we spoke to Nyakana later, he confirmed
21  that he was expressing that he felt like someone was watching
22  him and he was uncomfortable.  So he decided not to go forward
23  with the deal at that point, and he told Nyakana he wanted to
24  do it later, but to come with him.

25    Agents conducted a traffic stop at that time on the

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02482

ELH-11-0258

USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 53 of 69

1  maroon Impala that was being driven by Bryan Williams to

2  prevent Williams and Nyakana from leaving the area.

3  Subsequent to the traffic stop, officers arrested Bryan

4  Williams on the corner of Crestmont and Route 1, and officers

5  seized $269,000 from the trunk of Williams' vehicle.

6       Following Williams' arrest, per court-ordered

7  wiretap interceptions, law enforcement determined that Hayes

8  had called Williams three times on Tuesday, April 5th, two

9  times on Wednesday, April 6, and Hayes had sent a text message

10  to an unidentified person called Mr. Don, and the text message

11  stated "This is Bryan friend Lawrence. When you get a chance,

12  call me back."

13       So as you can see, each person that I've talked

14  about plays a role in this Hayes drug trafficking

15  organization, which is responsible for distributing multi-

16  kilograms of cocaine in the Baltimore area.

17       WITNESS.  So now does anybody have any questions?

18       MR. SIPPEL.  Okay.  Yeah, now for questions.

19       GRAND JUROR.  Just one other question.  You said

20  something about the cover product, strawberries, was destined

21  for the Giant.  Was that the location in Jessup, that

22  distribution center where the Giant --

23       WITNESS.  It is, yes.

24       GRAND JUROR.  Okay.  I was --

25       WITNESS.  Yeah.  What we ended up doing was

USA-02483

ELH-11-0258

USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 54 of 69

1   actually contacted them and still making the delivery of the

2   produce.

3        GRAND JUROR.   Oh.

4        WITNESS.   So it was a long day.

5        MR. SIPPEL.   Somebody out there saying, wow, these

6   are really good strawberries.

7        WITNESS.   Right.   Yes, you had a question?

8        GRAND JUROR.   Robert Nyakana, is his CDL license --

9   was he a resident of Maryland or California?

10       WITNESS.   He's actually a resident of Virginia.   So

11  his CDL license came back to the State of Virginia.   So I

12  think he's just -- you know, he has the truck and he's able

13  to, you know, make the deliveries, and that's how he's able to

14  go back and forth and do this in addition.

15       GRAND JUROR.   I missed something about this Mark

16  Anthony Hawkins.   What was his role in this?

17       WITNESS.   Okay.

18       GRAND JUROR.   He was the one with Williams at the

19  Staples?

20       MR. SIPPEL.   That's right.

21       WITNESS.   Right.

22       GRAND JUROR.   Oh, okay.

23       WITNESS.   He's -- right.

24       MR. SIPPEL.   He delivered the package to the

25  Staples with --

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

```
 1              WITNESS.  Right.
 2              GRAND JUROR.  Okay.  Good enough for me.  I just --
 3    thanks.
 4              GRAND JUROR.  Not a problem.  I take notes.
 5              MR. SIPPEL.  Any other questions?  Last chance.
 6              WITNESS.  You know you want to.
 7              GRAND JUROR.  Yeah.  Just one other thing, you
 8    know, you were saying about as far as the truck driver,
 9    basically, in other words, he's not acting -- he wasn't acting
10    as a physical mule like carrying something -- he was just
11    using his license, in a sense, his CDL, because he's
12    facilitating -- he was using his transport as a cover to be
13    able to use his truck kind of --
14              WITNESS.  Right, because, yeah, the truck was
15    just -- the strawberries were just the --
16              GRAND JUROR.  Product of that --
17              WITNESS.  Yeah.
18              GRAND JUROR.  Right.
19              MR. SIPPEL.  Yeah.
20              WITNESS.  And then he was able to do this --
21              GRAND JUROR.  So he was just using it as a cover,
22    right --
23              MR. SIPPEL.  Yeah --
24              GRAND JUROR.  He had extra space, hey, I can --
25              MR. SIPPEL.  Yeah.
```

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02485

1     BY MR. SIPPEL:

2        Q.   And, Special Agent Hewitt, correct me if I'm wrong,

3    it would be rare that there would just be, like, a truckload

4    of narcotics.  In your experience, when you've -- in these

5    types of very lucky situations where you recover something

6    like this, is it usually narcotics alone or are they mixed in

7    with something?

8        A.   It's usually they're trying to conceal it amongst

9    something, so --

10        GRAND JUROR.   Smuggling.

11        WITNESS.   Right.  We've seen drugs hidden in a

12   shipment of coffins.  We've seen them, you know, just hidden

13   in all kinds of places.  This just happened to be

14   strawberries.

15        GRAND JUROR.   So it was just by chance that he was

16   pulled over speeding in Illinois?  There was no surveillance

17   on him in Illinois?

18        WITNESS.   Nothing.  He was speeding on I-70, and

19   the trooper stated that there was either -- there wasn't -- or

20   he was pulled over for speeding, and then he's supposed to

21   give, I guess, paperwork to the trooper to show that he was in

22   fact headed to Maryland and what was being transported,

23   because they have to do a security check of what's inside the

24   truck.  And it didn't have a seal on it, so that's what

25   sparked the curiosity of the trooper is that it wasn't

USA-02486

ELH-11-0258

1   official documentation that the driver had.

2           BY MR. SIPPEL:

3       Q.   So yeah, and the thought lucky, in terms of law

4   enforcement, lucky is going through your mind, yes --

5       A.   Um-hum.

6       Q.   Sometimes luck plays a huge role in what we do, and

7   this was a very lucky stop for us --

8       A.   Lucky stop, um-hum.

9       Q.   I mean, it just -- sometimes that's just the way it

10  works.

11      A.   Um-hum.  And like I said --

12      Q.   Sometimes you get lucky --

13      A.   Yeah.

14      Q.   Sometimes we do a long investigation and come up

15  with, you know, a tiny bit of drugs.

16      A.   Um-hum.

17           MR. SIPPEL.  So this is just one of those we feel

18  very fortunate that it worked out this way.  Thoroughly lucky.

19           GRAND JUROR.  What time was that traffic stop in

20  Jessup done?

21           WITNESS.  It was kind of in the -- I believe it was

22  in the afternoon.  I may have taken the time out of it.  It

23  was right around afternoon time.

24           GRAND JUROR.  Have any of these two locations been

25  searched, the stash house and the --

USA-02487

ELH-11-0258

USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 58 of 69

1          MR. SIPPEL.   I'll talk to you about that after you

2   deliberate on the indictment.

3          GRAND JUROR.   Okay.

4          GRAND JUROR.   One other thing, just not to -- the

5   thing, the last thing was the -- you mentioned something about

6   that one drop-off, there was a child that was present there

7   the whole time.   Did they have any charge that was pending as

8   far as child -- for that driver, child endangerment, or

9   something --

10          MR. SIPPEL.   No.   That --

11          GRAND JUROR.   That --

12          MR. SIPPEL.   Yeah, that --

13          GRAND JUROR.   Right --

14          MR. SIPPEL.   Yeah.   Any other questions?

15          (No response)

16          MR. SIPPEL.   Seeing that there are none, I'm going

17   to ask that the witness be excused.   I'll ask her a few

18   follow-up questions.

19          BY MR. SIPPEL:

20    Q.   Special Agent Hewitt, have you told the grand jury

21   everything you know about the case or just answered the

22   questions that I've put to you?

23    A.   I've answered the questions.

24    Q.   Okay.   And if the grand jury has any further

25   questions for you, are you willing to come back and supplement

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02488

```
 1  your testimony today?

 2       A.   Absolutely.

 3       Q.   All right.

 4            MR. SIPPEL.   May the witness be excused?

 5            FOREPERSON.   Yes, sir.

 6            MR. SIPPEL.   All right.  Thank you, Special Agent

 7  Hewitt.

 8            GRAND JUROR.   Thank you.

 9            WITNESS.   Thank you.  Have a good day.

10            (Whereupon, at 11:52 a.m., the witness was excused

11  and was subsequently recalled at 12:00 p.m.)

12            BY MR. SIPPEL:

13       Q.   You're still under oath just for the record.

14       A.   Record?  Okay.

15       Q.   The question is one of the grand jurors had a

16  question saying that there was no indication that these

17  particular individuals had any intent to distribute the drugs.

18  I know the look on your face. Can you please explain to the

19  grand jury the significance of the quantity of the 136

20  kilograms of cocaine and whether that's distribution quantity

21  or personal use quantity and why you think that.

22       A.   Right.  The 136 kilograms street value is $13

23  million.  No one person is going to use or survive $13 million

24  worth of cocaine.

25            Bryan Williams, based on our investigation and
```

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02489

ELH-11-0258

1   surveillances, we believe is supplying this amount of

2   kilograms of cocaine to the Hayes drug trafficking

3   organization.   So he is specifically getting these drugs from

4   California to distribute here in the Baltimore, Maryland area.

5   And he's using -- and there's other people that are doing it,

6   that are also doing it.   We don't know how much Williams

7   intended to keep for himself and how much he was giving to

8   Hayes, but based on our investigation, we know that he is in

9   fact giving multikilograms of this cocaine to Hayes and for

10  Hayes to distribute.

11          MR. SIPPEL.   Does that take care of that?

12          GRAND JUROR.   Yeah.

13          MR. SIPPEL.   Okay.

14          WITNESS.   Okay.  Thank you.

15          GRAND JUROR.   Thank you.

16          (Whereupon, the witness was excused at 12:02 p.m.)

17

18

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting     Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02490

ELH-11-0258

USCA4 Appeal: 22-7406   Doc: 13   Filed: 04/10/2023   Pg: 61 of 69

1

2                          CERTIFICATE

3

4   I certify that these are the original notes and recordings

5   recorded by me of the testimony taken

6

7                             And

8

9   The proceedings held in the case of United States vs. Lawrence

10  Lee Hayes, Jr., et al., before the Grand Jury

11

12                            Held in

13

14  United States District Court, Baltimore, Maryland, on May 5,

15  2011.

16

17

18      May 26, 2011                  _Cynthea Sydnor Thomas_
            Date                      Cynthea Sydnor-Thomas
19                                    Official Reporter

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

USA-02491

# Exhibit 3

## REPORT OF INVESTIGATION

Page 1 of 2

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|

| 5. By: Mara R Hewitt, SA | | | 6. File Title |
| At: Baltimore DO | | | |

| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | | | 8. Date Prepared 03-21-2011 |

9. Other Officers: SA Mark Lester, SA Todd Edwards, SA Paul Neikirk, TFO Christopher Lamb

10. Report Re: Search Warrant for UPS Package Tracking# 1Z5AR3790305672878

*INCONSISTANT with 3-17-2011 Report by Todd Edwards*

### DETAILS

On March 17, 2011, Law Enforcement Agents and Officers observed Richard WILFORD and known HAYES DTO member Mark Anthony HAWKINS exiting the Staples Office Store located at 803 Goucher Boulevard, Towson, Maryland. WILFORD and HAWKINS were carrying packaging boxes and packaging material. The store is a known location where WILFORD ships packages to Los Angeles, California via UPS. Subsequently, Officers observed WILFORD and HAWKINS package three boxes in the Staples parking lot, and WILFORD take one of the packages into the store to be shipped via UPS. Based on this information Officers notified UPS of the suspicious nature of the package.

On March 17, 2011 at approximately 7:00 p.m., Drug Enforcement Agents and Officers intercepted a UPS package that was shipped through the Staples Store #0148, Towson, Maryland 21286 at the UPS Distribution Center in Loveton Circle, Hunt Valley, Maryland. The subject package was a box, brown in color, and displayed an electronic label which had listed the following addresses:

Sender: Janice Tate, 2514 Maryland Avenue, Baltimore, Maryland 21218 (410) 433-0159

Recipient: Ronald Tate, 224 Atlantic Avenue, Apartment 11, Long Beach, California 90802-3218

Also displayed on the electronic UPS Shipping Label was the shipping weight of fifteen (15) pounds.

At approximately 7:15 p.m., law enforcement deployed a drug detection dog, K-9 Maxx. The canine handler, Officer Frock, conducted a scan of a row of empty parcels. K-9 Maxx scanned the entire row of parcels and gave a positive alert for the odor of a controlled dangerous substance on the suspected drug

| 11. Distribution: Division WASHINGTON FLD DIV | 12. Signature (Agent)  Mara R Hewitt, SA | 13. Date 03-23-2011 |
|---|---|---|
| District Baltimore | 14. Approved (Name and Title) John F Walsh  GS | 15. Date 03-13-2011 |
| Other | | |

DEA Form - 6
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

USA-02084

## REPORT OF INVESTIGATION
*(Continuation)*

| | |
|---|---|
| 1. File No. | 2. G-DEP Identifier |
| 3. File Title | |

| | |
|---|---|
| 4. Page  2  of  2 | |
| 5. Program Code | 6. Date Prepared  03-21-2011 |

parcel. Immediately following the dog alert, TFO Lamb contacted the state's attorney's office to locate the Judge on call to sign a search and seizure warrant for the suspected drug parcel.

At approximately 8:30 p.m., Special Agent (SA) Mara Hewitt and Task Force Officer (TFO) Christopher Lamb obtained a Search and Seizure Warrant from the State of Maryland Circuit Court of Baltimore County for United Parcel Service (UPS) Package CA 906 9-02: Tracking Number 1Z5AR3790305672978.

At approximately 9:00 p.m., Agents and Officers executed the search warrant and located $100,000.00 in U.S. currency concealed in a VCR/DVD combo player inside the UPS shipping parcel.

The Investigation continues at the Baltimore District Office.

INDEXING

WILFORD, Richard

HAWKINS, Mark

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

USA-02085

| REPORT OF INVESTIGATION | | Page 1 of 2 |

SA
Todd Edwards

| 1. Program Code | 2. Cross File ☐ | Related Files | 3. File No. ▓▓▓ | 4. G-DEP Identifier ▓▓▓ |
|---|---|---|---|---|
| 5. By Todd C Edwards, SA At Baltimore MD | ☐ ☐ ☐ ☐ | | 6. File Title ▓▓▓▓▓▓▓▓▓ | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | ☐ | | 8. Date Prepared 03-17-2011 | |
| 9. Other Officers: | | | | |

10. Report Re: Surveillance of Richard WILFORD and Mark HAWKINS on 03-17-2011

## DETAILS

1.  On March 17, 2011 at approximately 11:25pm SA Edwards established surveillance at Staples Office Store located at 803 Goucher Ave Towson, MD.  While parking, SA Edwards observed Richard WILFORD exiting the store with several packaging boxes and packaging material.  When WILFORD approached his vehicle ( a 2010 Honda Crosstour) SA Edwards observed Mark Hawkins exit from the driver's side of 2000 Oldsmobile Min-van bearing Maryland Tag 4AE3539.  At this point SA Edwards observed WILFORD place the boxes between the two vehicle.  Wilford then opened the rear hatchback of the Honda and WILFORD and HAWKINS then moved between the vehicles and were obscured from SA Edwards view.

2.  At approximately 11:33am SA Edwards observed HAWKINS go to the rear of the mini-van and bring a large bag of  packaging peanuts and bring it to WILFORD who was still between the vehicles.

3.  At approximately 11:39am SA Edwards observed WILFORD place a sealed cardboard box on the parking lot pavement.  At approximately 11:45am SA Edwards observed HAWKINS take a small female child out of the rear of the Honda and bring her to the rear of the vehicle.

4.  At approximately 12:01pm SA Edwards observed WILFORD place two sealed cardboard boxes in the mini-van.  SA Edwards observed HAWKINS place the small child in the rear seat and depart the area.  SA Edwards then observed WILFORD take a package into the Staples.  At this time SA Edwards

| 11. Distribution: Division WASHINGTON FLD OFC District Baltimore Other ▓▓▓ | 12. Signature (Agent) Todd C Edwards, SA | 13. Date 03-17-2011 |
|---|---|---|
| | 14. Approved (Name and Title) John F Walsh GS | 15. Date 03-21-2011 |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

## REPORT OF INVESTIGATION

*(Continuation)*

| 1. File No. | 2. G-DEP Identifier |
|---|---|
| ▮▮▮▮▮▮▮▮ | ▮▮▮▮ |
| 3. File Title | |
| ▮▮▮▮▮▮▮▮▮▮▮ | |

4.
Page 2 of 2

| 5. Program Code | 6. Date Prepared |
|---|---|
| | 03-17-2011 |

departed the area. SA Edwards returned to the Staples and obtained a shipping manifest for the package that WILFORD dropped off at the UPS counter in the Staples. WILFORD put the sender down as Janice Tate 2514 Maryland Ave Baltimore, MD and the receiver as Ronald Tate 224 Atlantic Ave Apt 11 Long Beach, CA. SA Edwards has received previous information of WILFORD sending UPS packages to the above mentioned Long Beach, CA address utilizing the name Janice Tate. A check of several databases reveal that there is not a Janice Tate connected to 2514 Maryland Ave, nor is there a Ronald Tate connected to 224 Atlantic Ave Apt 11 Long Beach, CA.

### INDEXING

1. HAWKINS, Mark - ▮▮▮▮▮▮▮▮

2. WILFORD, Richard - ▮▮▮▮▮▮▮▮

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

USA-0218

Richard Wilford #28670-037
FCI Terminal Island
P.O. Box 3007
San Pedro, CA 90733


Clerk
U.S. Court Of
1100 East Main
Richmond, VA 2

RECE
U.S. MAI

LEGAL MAIL



U.S. POSTAGE PAID
FCM LG ENV
SAN PEDRO, CA
90731
APR 03, 23
AMOUNT
**$0.00**
R2305K142819-66

UNITED STATES
POSTAL SERVICE®

RDC 99

23219

Appeals, Fourth Circuit
Street, 5th Floor
3219

VED
RSHALS

Legal Mail